

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
JOHN DOE,

                               Plaintiff,

             -against-

RENSSELAER POLYTECHNIC
INSTITUTE, LeNORMAN J. STRONG,
Interim Vice President of Student Life,
TRAVIS APGAR, Assistant Vice President
and Dean of Students, LARRY HARDY,
Title IX Coordinator, ELIZABETH MARY
BROWN-GOYETTE, Title IX Investigator,
and LESLIE NORTON, Public Safety
Lieutenant and Title IX Investigator,

                             Defendants.
-------------------------------------------------------X

**COMPLAINT**

**JURY TRIAL DEMANDED**

Case No.   1:18-cv-1013 (MAD/DJS)

                             :

       Plaintiff John Doe, by his attorneys E. Stewart Jones Hacker Murphy, LLP, as and for his

Complaint, respectfully alleges as follows:

### THE NATURE OF THIS ACTION AND FACTS OF THE CASE

       1.     Plaintiff seeks redress against Defendants Rensselaer Polytechnic Institute

("RPI"), LeNorman J. Strong, RPI's Interim Vice President of Student Life, Travis Apgar, RPI's

Assistant Vice President and Dean of Students, Larry Hardy, RPI's Title IX Coordinator,

Elizabeth Mary Brown-Goyette, RPI's internal Title IX Investigator, and Leslie Norton, RPI's

Public Safety Lieutenant and internal Title IX Investigator, due to the actions, omissions, errors,

and the flawed procedures and/or negligence and overall failure to provide plaintiff with the

standard of due process to which he was entitled arising from the allegations of sexual

misconduct made against plaintiff, a male sophomore student at RPI in good standing with an

otherwise unblemished record.

1

## THE PARTIES

I.      **The Plaintiff**

2.      Plaintiff John Doe is a natural person residing in the State of Connecticut, with a permanent home address in Wilton, Connecticut.  During the events described herein, he was a student at RPI and resided off campus, near the college, in Troy, New York.

3.      Plaintiff grew up in Wilton, Connecticut with his mother, father, and two older sisters along with several cats and dogs.  He graduated from St. Luke's High School in June 2015.

4.      While in high school, he succeeded academically and earned the distinction as a Science, Technology, Engineering, and Math (STEM) scholar.  At St. Luke's, Plaintiff completed a year-long independent capstone project studying the removal of hydrofracking fluids from drinking water, which he presented before his teachers, peers, and parents.

5.      While in high school, plaintiff also enrolled in several Advanced Placement courses including chemistry, calculus, and statistics.  He earned an overall ACT score of 33, placing him in the 99th percentile of all test takers.  St. Luke's did not calculate their students' GPAs; however, when adjusted on traditional high school scale plaintiff earned a 3.3 GPA.

6.      In addition to his academic achievements, plaintiff participated in extracurricular activities both within and outside of school.  Athletically, plaintiff was a member of the varsity soccer team and ping pong club.  Plaintiff also engaged in the arts as a theater technician and as a percussionist in the concert and jazz bands.  Outside of high school, plaintiff completed numerous hours of community service.  Among other volunteer projects, plaintiff worked with Habitat for Humanity at their Habitat Restore in Benzie County, Michigan, one of the poorest counties in the state.

7.      Plaintiff was accepted to seven universities across the country, including defendant RPI, out of the ten to which he applied.  So impressive were plaintiff's academic and extracurricular credentials that RPI awarded plaintiff its prestigious Leadership Award, worth $12,000 per year toward tuition.

8.      Plaintiff ultimately chose to attend RPI and began there in the fall semester of 2015.  He initially majored in Chemistry but switched majors to Information Technology and Web Science with a concentration in Management.  This major brought with it potential for plaintiff's future job prospects, as RPI claims that graduates from this program have a 100% job placement rate within a few months of graduation and are regularly recruited by large technology firms such as Apple and Google.

9.      The courses plaintiff is taking in his major program are so specialized that few other schools accept plaintiff's coursework, making it nearly impossible for him, at this point in his undergraduate career, to complete his education at any school other than RPI.

## II.     Defendant RPI and Employees Thereof

10.     RPI is a private college located in Troy, New York.

11.     LeNorman J. Strong is the Interim Vice President of Student Life for RPI.  He coordinated and participated in the process for plaintiff's student conduct charges, from charging, through investigation and ultimate disposition.

12.     Travis Apgar is the Assistant Vice President and Dean of Students for RPI.  He coordinated and participated in the process for plaintiff's student conduct charges, from charging, through investigation and ultimate disposition.

13.     Larry Hardy is the Title IX Coordinator for RPI.  He coordinated and participated in the process for plaintiff's Title IX charges, from charging, through investigation, hearing,

appeal, and ultimate imposition of the sanctions which resulted in plaintiff's suspension from the school.

14.     Elizabeth Mary Brown-Goyette is an internal Title IX Investigator for RPI.  She investigated and prepared a fact-finding investigative report that was submitted to RPI's Case Management Team on Ms. Jane Roe's Title IX complaint against plaintiff and plaintiff's Title IX complaint against Ms. Roe. The Case Management Team uniformly adopted the recommendations of the Title IX Investigators in both cases.

15.     Leslie Norton is an internal Title IX Investigator and Public Safety Lieutenant at RPI.  Like Ms. Brown-Goyette, she investigated and prepared a fact-finding investigative report that was submitted to RPI's Case Management Team on Ms. Jane Roe's Title IX complaint against plaintiff and plaintiff's Title IX complaint against Ms. Roe. The Case Management Team adopted the recommendations of the Title IX Investigators in both cases.

## JURISDICTION AND VENUE

16.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 for claims arising under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, as well as diversity jurisdiction under 28 U.S.C. § 1332 because: (i) the amount in controversy exceeds $75,000.00, exclusive of costs and interest, and (ii) there is diversity of citizenship between the parties.

17.     This Court has personal jurisdiction over defendants RPI on the ground that RPI and its employees are conducting business within the State of New York.

18.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1931 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## JURY DEMAND

19.     Plaintiff hereby demands a trial by jury of all triable issues in this matter.

## FACTUAL ALLECATIONS COMMON TO ALL CLAIMS

I.     **Plaintiff's Time at RPI, His Relationship to the Complainant, and the Evening in Question**

20.     Allegations against plaintiff were made by a fellow RPI student, pseudonymously known herein as Jane Roe, also a sophomore at the time, on or about August 2017.

21.     The allegations stem from an encounter between plaintiff and Ms. Roe which allegedly occurred on June 20, 2017.

22.     Plaintiff and Ms. Roe first met each other, together with Ms. Roe's boyfriend during student orientation the summer before their freshman year at RPI.

23.     Plaintiff and Ms. Roe both entered RPI as chemistry majors and got to know one another during orientation, through chemistry major meetings, and lunches they shared with one another along with Ms. Roe's boyfriend.

24.     Once freshman year began, plaintiff and Ms. Roe had several first-semester classes together, including chemistry, and remained good friends, texting one another occasionally about coursework.

25.     Plaintiff and Ms. Roe would also spend time together and talk during and immediately after class sometimes.

26.     During their second semester, plaintiff and Ms. Roe did not see much of one another, but always exchanged pleasantries in the residence hall where they both lived.

27.     Throughout this time plaintiff was similarly friendly with, but never close to, Ms. Roe's boyfriend.

28.     In the first semester of their sophomore year, plaintiff and Ms. Roe again had classes together – Organic Chemistry I, Experimental Chemistry I, and Equilibrium Chemistry – and sat together in two of those classes.  They would also occasionally study together before tests and eat together after class, but otherwise spent little to no time together that semester.

29.     The next semester, spring of sophomore year, plaintiff and Ms. Roe had two classes together, and worked closely together under a shared lab hood in Experimental Chemistry.

**II.     Their contact outside of class followed a pattern similar to that of the previous semesters in which they had classes together.**

30.     Plaintiff and Ms. Roe eventually became close friends and began to spend time together outside of class.

31.     During the summer of 2017, both plaintiff and Ms. Roe were still in Troy attending summer classes at RPI.

32.     On June 20, 2017, plaintiff and Ms. Roe were texting with each other to discuss getting dinner together with a mutual friend that evening to celebrate plaintiff's birthday.

33.     However, the mutual friend canceled, and plaintiff and Ms. Roe changed their plans.  Ms. Roe made herself dinner at her apartment and then walked to plaintiff's apartment where they intended to drink and spend time together.

34.     At plaintiff's apartment and in the company of his three roommates (known herein as "Roommate 1," "Roommate 2," and "Roommate 3"), Ms. Roe consumed approximately three shots of vodka while plaintiff consumed four or five.

35.     After about thirty minutes of sitting and talking with plaintiff's roommates, plaintiff and Ms. Roe retired to plaintiff's bedroom where they continued to talk.

36.     During this time, Ms. Roe consumed one to three more shots of vodka and plaintiff consumed three or four more.

37.     The parties discovered a mutual interest in the television show "The Office" and began to watch it on plaintiff's television, laying on plaintiff's bed to do so.

38.     Shortly thereafter, Ms. Roe recounted to plaintiff a dream that she had told plaintiff about several days before, in which plaintiff and Ms. Roe were cuddling.  She then proceeded to put her arm and leg over plaintiff as they lay on plaintiff's bed, placing her leg over plaintiff's groin.

39.     Bewildered by Ms. Roe's advances, because he knew she had a boyfriend at the time, plaintiff excused himself and went downstairs to raise this with Roommate 1, a close female friend.

40.     Plaintiff explained to Roommate 1 what had happened in his bedroom and told her that Ms. Roe was "coming on" to him.  Plaintiff then went back upstairs to finish watching "The Office" with Ms. Roe.

41.     When plaintiff got back to his room and laid once again on his bed, Ms. Roe again put her arm and leg over him in the same way as before.  She told plaintiff that there was "no harm" in cuddling, even though she had a boyfriend.

42.     The parties watched television for a few more minutes until Ms. Roe turned to plaintiff and brought up the subject of his ex-girlfriend.  Plaintiff had broken up with his ex-girlfriend about ten months before and often spoke to Ms. Roe about his past relationship.  Ms. Roe, aware that plaintiff had not had any romantic partners since his breakup, asked plaintiff, "So you haven't kissed a girl in a year?"  Plaintiff confirmed this fact, and Ms. Roe then, while laying and cuddling on plaintiff's bed, asked if he wanted to kiss her.

7

43.     Plaintiff told Ms. Roe that he did not want to kiss her. Ms. Roe nevertheless leaned over and kissed him.  Ms. Roe continued to kiss plaintiff in this manner for several minutes before she climbed atop plaintiff, and then continued to kiss him for several more minutes from that position.

44.     Ms. Roe then helped plaintiff to remove her bra.

45.     With Ms. Roe still atop and astride plaintiff, she continued to kiss plaintiff, and then began to rub plaintiff's genitalia through his clothes.

46.     Ms. Roe next removed her shorts and underwear.

47.     Once Ms. Roe's clothes were off, she continued to kiss plaintiff, and then Ms. Roe placed plaintiff's hands on her bare breasts.

48.     Ms. Roe next removed plaintiff's shorts and underwear and began manually stimulating his genitalia.

49.     Following this, while plaintiff lay on his back, Ms. Roe initiated intercourse by mounting plaintiff and placing his penis in her vagina.  The parties had sex in this position for several minutes. Plaintiff then performed oral sex on Ms. Roe.

50.     Plaintiff continued to do so for several minutes until intercourse resumed with Ms. Roe now on her back.

51.     A short time later the parties again changed position such that plaintiff was behind Ms. Roe, who was on all fours.  They mutually changed positions again, and Ms. Roe returned to laying on her back, and they continued to have intercourse.

52.     Eventually, after having engaged in intercourse for some considerable time, Ms. Roe abruptly got out of plaintiff's bed and reached for her clothes.

53.     Plaintiff asked Ms. Roe what was wrong.  She replied that "this shouldn't have happened."

54.     Ms. Roe then put her clothes back on and stood up.  Plaintiff put on his pants and walked Ms. Roe to his door.  Plaintiff walked Ms. Roe to the front door and, opening it offered to walk her home, as plaintiff did not consider it safe for a young woman to walk home late at night in his neighborhood.

55.     Ms. Roe declined plaintiff's offer and left his apartment, alone.

56.     At no point during their sexual encounter or after it did Ms. Roe indicate that any of the sexual activities in which she engaged with plaintiff were non-consensual.  Throughout the encounter Ms. Roe was not only the initiator but also the director of the sexual activity between her and plaintiff.

57.     Immediately after Ms. Roe's departure, plaintiff went again to Roommate 1 and told her about what had happened between himself and Ms. Roe.  They mutually concluded that Ms. Roe must only have left because she decided that she had made a mistake by cheating on her boyfriend, not for the first time.

58.     Plaintiff then went to bed.

59.     The following day, plaintiff received a call from Ms. Roe's phone number, but when he answered it was Ms. Roe's boyfriend on the line.  Ms. Roe's boyfriend told plaintiff that he would kill plaintiff if plaintiff talked to Ms. Roe ever again.

**III.   Aftermath - Title IX Charges**

60.     More than one year ago – and nearly two months after plaintiff and Ms. Roe had consensual sex – plaintiff received an email from Mr. Larry Hardy on August 13, 2017 (annexed hereto as Exhibit "A").  The email stated that its purpose was to inform plaintiff that RPI

received a complaint against him alleging a violation of the college's Student Sexual Misconduct Policy (annexed hereto as Exhibit "B") and that RPI had opened a Title IX investigation. Specifically, Mr. Hardy wrote that "[i]t was reported that you were involved in a sexual assault against a female student of Rensselaer in June 2017 at an off-campus location that you reside in." No further details were provided.

61.     Thereafter, on August 16, 2017, plaintiff received an email from Dean Travis Apgar issuing an Order of No Contact thereby ordering that plaintiff shall not have further contact with Jane Roe.

**IV.      Title IX Procedure – Meetings, Hearing, Decision, and Sanctions**

62.     On or about September 7, 2017, plaintiff with his chosen counsel, E. Stewart Jones Hacker Murphy, LLP, who served as his advisor during this Title IX investigation met with Mr. Hardy to review RPI's Title IX policies and procedures.  Mr. Hardy informed plaintiff that the Title IX investigators assigned to investigate this matter were Elizabeth Mary Brown-Goyette and Lieutenant Leslie Norton.  Among other enumerated policies that were discussed by Mr. Hardy, plaintiff was told that he had the right to choose to participate or not participate in the investigation.

63.     At the September 7, 2017 meeting, plaintiff was never informed of any of the specific allegations against him and was only told that he was accused of engaging in sexual conduct without the consent of the other party, despite pressing defendant Hardy for specifics.

64.     Defendant Hardy was asked whether Ms. Doe had been interviewed.  Mr. Hardy neither confirmed nor denied whether she had been interviewed, repeating over and over that the allegation that plaintiff had engaged in sexual contact without consent was "all that they had."

65.     Pursuant to RPI policy, plaintiff expressly exercised his right to decline to participate in the investigation of Ms. Roe's complaint.

66.     Following the initial meeting and through a discussion with Mr. Hardy, James C. Knox, Esq., one of plaintiff's advisors, learned that plaintiff was accused of committing sexual assault in violation of RPI's policy based on Ms. Roe's inability to consent to sexual activity due to her intoxication.

67.     On or about early October 2017, plaintiff made a complaint against Ms. Roe alleging that she violated RPI's policy and committed sexual assault based on plaintiff's inability to consent due to intoxication.

68.     On or about October 19, 2017, plaintiff with advisor James C. Knox, Esq., attended a Title IX investigation interview into his complaint against Ms. Roe.   Title IX investigators Ms. Brown-Goyette and Lieutenant Norton—the same investigators into Ms. Roe's complaint against plaintiff—were present to interview plaintiff about his complaint.   On behalf of plaintiff, Mr. Knox objected to having the same set of Title IX investigators investigate both plaintiff's and Ms. Roe's complaints.   The investigative interview concluded upon objection.

69.     RPI's policies state that trained internal or external investigators will interview relevant witnesses and gather and review relevant evidence to complete their fact-finding investigative report.

70.     In the usual RPI Title IX sex misconduct investigation, RPI interviews complainants first, and respondents only at a later date.   In the case of plaintiff's complaint, they sought to do the opposite without explanation.

71.     In fact, during the course of the investigations of each complaint, RPI, and defendant Hardy specifically, refused to disclose whether Ms. Doe had been interviewed.

72.     Later, plaintiff learned that, in fact, Ms. Doe had been interviewed by investigators Brown and Norton long before the September 7, 2017 meeting, at which Mr. Hardy had informed plaintiff that he had no specifics to provide.

73.     On or about October 30, 2017, Mr. Hardy wrote plaintiff an email in response to his objection to the October 19, 2017 investigative interview with the Title IX investigators. Mr. Hardy informed plaintiff that his objection had been submitted to the Case Management Team for review, and the Case Management Team concluded that RPI would not assign different Title IX investigators to plaintiff's complaint. In his email, Mr. Hardy stated that the basis for the decision was to eliminate the possibility of conflicting determinations arising from the same incident.

74.     Mr. Hardy thus acknowledged the possibility of differing determinations but sought to guarantee a certain outcome in the RPI investigations.

75.     Over objection, on or about November 21, 2017, plaintiff attended an investigative interview with Title IX investigators Ms. Brown-Goyette and Lieutenant Norton—the same investigators assigned to Ms. Roe's complaint and who had interviewed Ms. Roe months prior, unbeknownst to plaintiff at that time.

76.     At this investigative interview on plaintiff's complaint, it was obvious from the tone, demeanor, and manner of the Title IX investigators from the outset that they believed plaintiff had committed a violation of RPI's Student Sexual Misconduct Policy, before asking a single question.

77.     The interview was conducted by defendants Norton and Brown with thinly-veiled skepticism and palpable incredulity directed at the responses of plaintiff.

78.     Sometime thereafter, Mr. Hardy informed plaintiff that the Case Management Team had accepted the recommendation of defendant investigators Brown and Norton, who had determined that there was sufficient evidence for a Title IX misconduct case to proceed forward against him on Ms. Roe's complaint.   However, the same Case Management Team, again following the recommendation of defendant investigators Brown and Norton, had determined that there was insufficient evidence on plaintiff's complaint against Ms. Roe.

79.     In other words, only Ms. Roe's complaint advanced forward while plaintiff's complaint was effectively dismissed by defendants, all upon the decision and determination of the defendant investigators Brown and Norton.

80.     The effect of the dismissal of his complaint was that plaintiff was denied any hearing on his allegations, RPI having administratively concluded that they were without merit.

81.     On or about February 13, 2018, plaintiff timely objected to both determinations of the Case Management Team.   Plaintiff requested hearings both as a complainant and a respondent before separate hearing panels.

82.     Plaintiff's request for a hearing as a complainant was denied.   His request for a hearing as respondent was granted, on or about March 16, 2018.

83.     On or about March 26, 2018, plaintiff and his advisor met with Mr. Hardy to review Title IX hearing process and procedure.

84.     On or about April 10, 2018, plaintiff informed defendants that he intended to call Roommate 1 as a witness at the hearing and provided questions that he wanted the hearing panel to ask Ms. Roe and her witnesses.

85.     On or about April 23, 2018, defendants conducted a Student Sexual Misconduct hearing.   Plaintiff was present at the hearing with his mother and his advisor Julie A. Nociolo,

Esq., of E. Stewart Jones Hacker Murphy LLP. As arranged by the defendants, Ms. Roe and plaintiff remained in separate rooms and did not cross paths during the hearing. Rather, when one party was not present in the hearing room, they were able to listen to the audio on a speaker phone from another room. However, that party had no way to visually see the hearing while not present in the hearing room.

86. In addition to plaintiff and Ms. Roe, two witnesses testified. Ms. Roe called her boyfriend as a witness. Plaintiff called Roommate 1 as a witness.

87. On or about May 25, 2018, plaintiff received the determination of the Hearing Board (annexed hereto as Exhibit "C"), which found based on a preponderance of the evidence that he violated the Sexual Assault provision of RPI's Student Sexual Misconduct Policy.

88. Based on the Hearing Board's determination, they issued the following sanctions against plaintiff: suspension for the summer and fall 2018 semesters, a persona non grata order banning plaintiff from entering RPI property, a transcript notation stating that plaintiff has been suspended from RPI "after a finding of responsibility for a violation of the Student Sexual Misconduct Policy of [RPI]." Plaintiff was informed of the Hearing Board's determination and sanctions via letter signed by Mr. LeNorman Strong, RPI's Interim Vice President for Student Life.

## V.    Appeal of Title IX Decision

89. Consistent with RPI's policies, on or about May 30, 2018, plaintiff timely appealed the Hearing Board's decision on several procedural grounds. See Plaintiff's Appeal Letter annexed hereto as Exhibit "D."

90. On or about June 13, 2018, Vice President Strong emailed a letter to plaintiff responding to the grounds argued in his appeal. See Defendant Vice President Strong's email

annexed hereto as Exhibit "E." Vice President Strong found no procedural errors and upheld the Hearing Board's determination and sanctions, including plaintiff's suspension from RPI.

91.     Plaintiff has been severely damaged by the suspension.  His education has been put on hold, his academic future has been cast into doubt by the notation defendants attached to his transcript, his position as a productive member of the RPI campus community has terminated, and he stands to lose his scholarship and with it his ability to afford an RPI education and degree. All of this harm does not even enumerate the impact on plaintiff's psychological and emotional health.  Thus, plaintiff John Doe brings this action to obtain relief based on causes of action for, among other things, violations of Title IX of the Education Amendments of 1972 and state law.

## AS AND FOR A FIRST CAUSE OF ACTION
### Violation of Title IX of the Education Amendment of 1972

92.     Plaintiff repeats and realleges each and every allegation above as if set forth fully herein.

93.     Title IX of the Education Amendment of 1972 ("Title IX") provides, in relevant part, that "No person in the United States shall, on the basis of sex, be excluded from participation in, he denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal Financial Assistance."

94.     Title IX applies to an entire school or institution if any part of that school receives federal funds; for example, athletic programs are subject to Title IX, even though collegiate sports receive little to no federal funding.

95.     Upon information and belief, RPI receives federal financial assistance.

96.     Both the federal Departments of Education and Justice have promulgated regulations under Title IX that require schools to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student … complaints alleging any actions

which would be prohibited" by Title IX or regulations thereunder.[1]   Such prohibited actions

include all forms of sexual harassment, including sexual intercourse, sexual assault and rape.[2]

97.     Schools covered by Title IX must adopt procedures that not only "ensure the Title

IX rights of the complainant," but must also "accord[] due process to *both parties involved.*"[3]

98.     The "prompt and equitable" procedures that a school must implement to "accord[]

due process to both parties involved" must include, at a minimum:

    i.   "Notice … of the procedure, including where complaints may be filed;

    ii.   Application of the procedure to complaints alleging [sexual] harassment…

    iii.   Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence;

    iv.   Designated and reasonably prompt timeframes for the major stages of the complaint process;

    v.   Notice to the parties of the outcome of the complaint; and

    vi.   An assurance that the school will take steps to prevent the recurrence of any harassment and to correct its discriminatory effects on the complainant and others, if appropriate."[4]

99.     Based on the foregoing, defendants have deprived plaintiff, on the basis of his

sex, of his rights to due process, fundamental fairness, and equal protection under Title IX

through the improper administration and/or the existence in its current state, of defendants'

Student Sexual Misconduct Policy and Procedures.

100.     Defendants conducted their investigation into the events of June 20, 2017 and its

subsequent hearing in a manner that was biased against plaintiff.   Plaintiff not only arrived at an

---

[1] 34 C.F.R. § 106.8 (b) (U.S. Dep't of Education); 28 C.F.R. § 54.135 (b) (U.S. Dep't of Justice).
[2] *See generally* U.S. Department of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment by School Employees, Other Students, or Third Parties – Title IX*, at 19-21 & nn. 98-101, *available at* https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf (last visited Aug. 20, 2018).
[3] Id. at 22 (emphasis added).
[4] Id. at 20.

erroneous finding of non-consensual sex perpetrated by plaintiff at odds with the evidence, but refused to entertain plaintiff's claim that his accuser had sexually assaulted him in the exact same way.

101.   In so doing, defendants have denied to plaintiff the Title IX rights due to him as both accused and accuser.  In his standing as a student accused of sexual assault, defendants have denied plaintiff the due process to which he was entitled by unaccountably crediting Ms. Roe's version of events over his own and imposing upon him a sanction far out of proportion to the accusations against him, especially when juxtaposed with the lack of any sanction imposed upon Ms. Roe.

102.   In his standing as accuser, defendants denied plaintiff an "adequate, reliable, and impartial investigation" into the charges he sought to bring, and by refusing to address his complaint denied him the "opportunity to present witness and other evidence."

103.   The only difference between the charges Ms. Roe and plaintiff brought against one another is their respective sexes, and, thus, it can be from this factor alone that the differing outcomes of their cases arise.

104.   Defendants have further violated Title IX by failing to take action likely to prevent both sexual assault against males and situations in which males are improperly denied the opportunity to make complaints against females in the future.

105.   RPI has created an environment in which an accused male is fundamentally denied the due process guaranteed under Title IX by prosecuting male students under a presumption of guilt.  Such a one-sided process has arbitrarily and selectively denied plaintiff, because of his sex, of educational and extracurricular opportunities and benefits at RPI.

106.    RPI's stated policies and procedures, together with its violations only with respect to plaintiff, as a male student accused of sexual assault, demonstrate defendants' gender-based practices with respect to handling Title IX complaints against accused male students.

107.    For example, under defendants' definition, "Sexual Assault means any actual, attempted, or threatened sexual contact with another person without that person's consent," while it defines sexual misconduct as "any unwelcome conduct of a sexual nature … perpetrated against an individual without their consent."  Consent is the material term in both definitions.

108.    Defendants imposed sanctions on plaintiff because he allegedly engaged in sexual behavior with Ms. Roe without her consent.  This determination demonstrates defendants' bias because, although plaintiff's testimony consistently evinced consent throughout his encounter with Ms. Roe, defendants instead credited Ms. Roe's non-consensual version of events.

109.    Even assuming *arguendo*, that the sexual contact between Ms. Roe and plaintiff was non-consensual because Ms. Roe was too intoxicated to consent, defendants should have imposed sanctions on Ms. Roe as well.  Indeed, plaintiff was equally if not more intoxicated, similarly unable to consent, and, even more, Ms. Roe *initiated* their sexual encounter.

110.    Moreover, the hearing itself deviated from defendants' Policy and Title IX requirements.

111.    As examples, the Hearing Board permitted Ms. Roe to refer to a pre-written statement while plaintiff was not, the Hearing Board applied a much lower standard of evidence to Ms. Roe's testimony than to plaintiff's; the Hearing Board improperly modified several of plaintiff's questions to Ms. Roe, preventing plaintiff from testing Ms. Roe's credibility; but the Hearing Board did not alter her questions to plaintiff.

112.   Additionally, defendants failed to provide plaintiff with any findings or reasoning for the Hearing Board's determination.

113.   Defendants imposed sanctions on plaintiff disproportionate to the severity of the charges levied against him.   Notably, the case presented difficulties in proof, particularly, concerning Ms. Roe's untested credibility.   Furthermore, plaintiff had an otherwise clean disciplinary record and his exemplary character. Again, Ms. Roe suffered no sanctions as a result of the complaint brought against her.

114.   This, upon information and belief, is representative of the punishments doled out by RPI against male students found in violation of defendants' Policy, while female students such as Ms. Roe suffer no consequence when they engage in prohibited conduct of similar seriousness.

115.   Upon information and belief, the vast majority of Title IX complaints at RPI are made by female students against male students, and the vast majority of those cases are determined in favor of the female student.   Indeed, in the present case, defendants would not allow plaintiff, a male student, to advance complaint against, Ms. Roe, a female student.

116.   Upon information and belief, defendants' Policy was developed, in part, to refute criticisms and/or for public perception that defendants insufficiently protected sexually assaulted female students by creating a process to favor female students over male students at RPI, which guidelines and regulations were developed in reaction to and as a product of social media and media climate and discussions which portray male students as the face of on-campus assault.

117.   Based on the foregoing, defendants' Policy facially and as applied to plaintiff discriminates against male students at RPI.

118.    Based on the foregoing, male respondents in sexual assault cases at RPI, including plaintiff in particular, are discriminated against solely on the basis of sex in violation of Title IX. They are subjected to a process biased against them and carried out under an presumption of guilt, which deprives them of the right to make their case – whether in their own defense or in accusing a female student – in a manner identical to that which RPI affords its female students, thus denying male students such as plaintiff of even the most basic rights, including due process, mandated under Title IX.

119.    As a result of the foregoing, plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorney's fees, expenses, costs, and disbursements, as well as the removal of all marks on his transcript and termination of the suspension arising from the student conduct proceeding underlying the present case.

## AS AND FOR A SECOND CAUSE OF ACTION
## Violation of OCR Title IX Rules

120.    Plaintiff repeats and realleges each and every allegation above as if it is fully set forth herein.

121.    The United States Department of Education Office for Civil Rights ("OCR") requires that colleges that receive federal funds must adhere to Title IX, which prohibits discrimination on the basis of sex.

122.    OCR requires colleges to process complaints of sexual misconduct in accordance with its established procedures.

123.    OCR requires colleges to engage in "prompt, thorough, and impartial" investigations of allegations of sexual misconduct.

124.    OCR requires colleges to perform adequate, reliable, and impartial investigations of complaints, including an equal opportunity for both parties to present relevant witnesses and other evidence.

125.    OCR requires colleges to afford the complainant and the accused student similar and timely access to any information that will be used at the hearing.

126.    OCR requires to colleges to maintain documentation of all proceedings which includes written findings of fact, transcripts, and or audio recordings.

127.    OCR requires colleges to ensure that all employees are trained with respect to applicable confidentiality requirements.

128.    OCR requires that all colleges must provide due process to the alleged perpetrator of sexual misconduct.

129.    In a similar vein, New York State Higher Education guidance materials provide that student conduct cases should provide respondents with the opportunity to offer evidence during an investigation and to present evidence and testimony at a hearing, where appropriate, and to have access to a full and fair record of any such hearing.

130.    This guidance provides that respondents are not require to "prove a negative." In other words, the institution cannot begin a disciplinary process with a presumption that the respondent must prove that consent existed.

131.    In plaintiff's complaint against Ms. Roe, defendants neither promptly, thoroughly, nor impartially investigated plaintiff's allegations of sexual assault against Ms. Roe.

132.    Defendants allowed the same set of investigators assigned to Ms. Roe's complaint against plaintiff to investigate plaintiff's complaint against Ms. Roe. After an approximate one-month delay, the investigators and the Case Management Team informed plaintiff that they

21

would not be further investigating his allegations and would not afford him a hearing. The Case Management Team's determination that a male student's allegations, based on the same set of facts as a female student's allegations, had less quantum of evidence than the female student's allegations demonstrates the gender bias these investigators and Case Management Team carried and brought to the investigation and evaluation of plaintiff's case.

133.    In treating plaintiff differently than Ms. Roe in an identical situation, defendants denied plaintiff the due process rights guaranteed to him under defendants' own Policy, as well as Title IX and the OCR guidance thereto.

134.    Defendants also violated plaintiff's due process rights by arriving at a decision that did not meet preponderance of the evidence standard—the governing standard in all Title IX determinations.

135.    While OCR guidance guarantees similar access to all information used at a hearing, plaintiff spent much of the hearing sequestered in a room that had only audio, and no visual feed of the proceedings. As a result, plaintiff had no way of knowing if, for example, all witnesses were properly sequestered or if the hearing was otherwise conducted consistent with due process.

136.    Defendants' stated polices and procedures, together with their violations thereof only with respect to plaintiff as a male accused of sexual assault, demonstrate defendants' gender-based practices with respect to males accused of sexual assault at RPI.

137.    As a result of the foregoing, plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorney's fees, expenses, costs, and disbursements, as well as the removal of all notations on his transcript and termination of the suspension arising from the student conduct proceeding underlying the present case.

## AS AND FOR A THIRD CAUSE OF ACTION
### Defendants Reached an Erroneous Outcome in the Adjudication of Their Title IX Action Against Plaintiff

138.   Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

139.   Following the sexual encounter between plaintiff and Jane Roe on June 20, 2017, defendants charged plaintiff with and found him responsible for violating its Student Sexual Misconduct Policy ("the Policy").

140.   Defendants imposed a number of sanctions upon plaintiff as a result of its finding, including suspension from RPI and a notation on his undergraduate transcript.  The notation indicates that plaintiff was found in violation of RPI's Student Sexual Misconduct Policy.

141.   Defendants' Policy defines "sexual assault" as "any actual, attempted or threatened sexual contact with another person without that Person's consent."  RPI Student Sexual Misconduct Policy § I (H)(13).

142.   The Policy definition also states that "[RPI] encourages reporting of all misconduct." Id.

143.   The Policy further defines consent, in relevant part, as follows:

> Affirmative consent is a knowing, voluntary, and mutual decision among all participants to engage in sexual activity. Consent can be given by words or actions, as long as those words or actions create clear permission regarding willingness to engage in the sexual activity.  Silence or lack of resistance, in and of itself, does not demonstrate consent. The definition of consent does not vary based upon a participant's sex, sexual orientation, gender identity, or gender expression.

> The following principles are reflected in the Policy definition of affirmative consent:

- Consent is required regardless of whether the person initiating the act is under the influence of drugs and/or alcohol.
- Consent cannot be given when a person is incapacitate, which occurs when an individual lacks the ability to knowingly choose to participate in sexual activity… Depending on the degree of intoxication, someone who is under the influence of alcohol, drugs, or other intoxicants may be incapacitated and therefore unable to consent.

144.    With regard to intoxication, the Policy states that "[w]here alcohol … is involved, incapacitation is determined by how the alcohol … consumed impacts a person's decision making capacity, awareness of consequences, and ability to make informed judgments.

145.    Defendants' investigation determined plaintiff violated its Policy under these definitions even though his relations with Ms. Roe failed to fall under defendants' definition of sexual misconduct.

146.    Until the point Ms. Roe broke off the sexual encounter, she never indicated to plaintiff that the sexual activities in which the parties were mutually engaging – and which Ms. Roe had initiated – were unwelcome or non-consensual.

147.    The outcome of the school's process, which found plaintiff responsible and resulted in his suspension from RPI, was erroneous, because plaintiff did not engage in any action prohibited under defendants' policy.

148.    Moreover, because defendants found plaintiff responsible on the theory that Ms. Roe was too intoxicated to consent, she should also have been found responsible for violations of the Policy and suspended.  Plaintiff consumed far more alcohol and was more intoxicated than Ms. Roe before their sexual encounter, and, thus, less able to consent to sexual activity than Ms. Roe.

24

149.   Plaintiff and Ms. Roe engaged in the same behavior and brought complaints against one another predicated on that behavior, however, plaintiff was found responsible, suspended, and now has a notation on his transcript.

150.   Ms. Roe, by contrast, as a result of defendants' inconsistent and erroneous application of its Policy, suffered no consequences for her nearly identical actions, because of her status as a female student alleging sexual misconduct against a male student.

151.   As a direct and foreseeable consequence of these breaches, plaintiff sustained substantial damages including, but not limited to, emotional distress, loss of educational and extracurricular opportunities, economic injures, loss of future employment opportunities, and other direct and consequential damages.

152.   As a result of the foregoing, plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorney's fees, expenses, costs, and disbursements, as well as the removal of all marks on his transcript and termination of the suspension arising from the student conduct proceeding underlying the present case.

### AS AND FOR A FOURTH CAUSE OF ACTION
### Defendants Selectively Enforced and Violated its Own Policies

153.   Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

154.   The "Statement of Intent" in defendants' Policy states that defendant is:

> [C]ommitted to maintaining a safe and health learning, living and working environment in which *no member* of the community is, on the basis of sex … excluded from participating in, denied the benefits of, or subjected to discrimination in any Institute program or activity.

RPI Student Sexual Misconduct Policy § I (A) (emphasis added).

155.   The Statement of Intent continues:

> In support of the overall goals of [the defendants], the purpose of the [the Policy] is to maintain a campus living, learning and working environment that supports [defendants'] educational mission, maintains respect and dignity for members of the Rensselaer community, and protects the rights of *all* members of the campus community.

Id. (emphasis added)

156.   The Statement of Intent states further that defendants are "also committed to fostering a community that promotes prompt reporting of all types of Sexual Misconduct and timely and fair resolution of Complaints of Sexual Misconduct." Id.

157.   The "Student Bill of Rights," laid out in the Policy ensures similar rights.  Under that section of the Policy:

> All students have the right to:
>
> 2.  Have disclosures of domestic violence, dating violence, stalking and sexual assault treated seriously;
> 4.  Participate in a process that is fair, impartial, and provides adequate notice and a meaningful opportunity to be heard.
> 6.  Be free from any suggestion that the reporting individual is at fault when these crimes and violations are committed or should have acted in a different manner to avoid such crimes or violations.

RPI Student Sexual Misconduct Policy § I (D).

158.   According to RPI's Policy, defendants are "also committed to providing equal opportunities to all persons regardless of race, color, religion, sex, pregnancy...   [e]qual opportunity extends to all aspects of the academic and student life relationship." RPI Student Sexual Misconduct Policy I (F)(2).

159.   Defendants also guarantee, by virtue of their Policy, that they are "committed to treating *all* members of the community with dignity, care, and respect.  Every individual who experiences or is affected by Sexual Misconduct whether as a complainant, respondent or third

party, will have equal access to care and support throughout the Institute." RPI Student Sexual Misconduct Policy § II (B).

160.    Throughout its Policy, defendants makes numerous references to the protections enshrined within that documents explaining they are guaranteed to *all* members of the RPI community. Defendants, however, selectively enforced its Policy only in Ms. Roe's favor and deprived plaintiff of the rights ostensibly guaranteed to him.

161.    The Policy's Statement of Intent declares that "no member of the community should be excluded from participating in, denied the benefits of, or subjected to discrimination" on the basis of sex. Defendants enforced this policy in favor of Ms. Roe but, although plaintiff was actually the victim of sexual misconduct, the school discriminated against him, denied him the benefits of his status as an RPI student and excluded him from participating in any aspect of student life, because he was a male student accused and wrongfully found responsible for sexual misconduct.

162.    The Statement of Intent further provides that the purpose of the Policy is to "protect[] the rights of *all* members of the campus community." Defendants certainly attempted to protect Ms. Roe's rights; it made no attempt to do so for plaintiff.

163.    The Policy states that defendants are "committed to fostering a community that promotes prompt reporting of all Sexual Misconduct." Defendants made plaintiff aware of Ms. Roe's complaint immediately after it was lodged by her. By comparison, defendants never took plaintiff's equally legitimate claim seriously enough to even bring charges under the Policy against Ms. Roe.

164.    In so doing, defendants selectively enforced the Policy's Student Bill of Rights, which promises to all students that these disclosures of sexual assault will be taken seriously.

Defendants seriously investigated Ms. Roe's claims against plaintiff, ultimately leading to his suspension. Defendants, however, ignored plaintiff's claims arising from the same incident and alleging the same facts.

165.    The Student Bill of Rights also states that "[a]ll students have the right to … a process that is fair, impartial, and provides a meaningful opportunity to be heard." Ms. Roe was given the opportunity to make her case against plaintiff. Plaintiff was never afforded an opportunity to be heard at a hearing on his allegations against Ms. Roe.

166.    Defendants express their commitment to providing equal opportunities to all in "all aspects of the academic and student life relationship," and to treating "*all* members of [their] community with dignity, care and respect."

167.    At the hearing, the Board permitted Ms. Roe to read from a pre-prepared statement, while plaintiff was prohibited from even referring to the same.

168.    Moreover, plainly, by bringing charges, conducting a hearing against, and ultimately suspending plaintiff—all while refusing to entertain plaintiff's identical claims against his accuser—defendants have selectively, arbitrarily, and improperly failed to protect the rights of *all* RPI students.

169.    Plaintiff and Ms. Roe's allegations against one another were identical, therefore, the only possible explanation for the different application of defendants' Policy and the outcome is the difference in the parties' sex.

170.    As a result of the foregoing, plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorney's fees, expenses, costs, and disbursements, as well as the removal of all notations on his transcript and termination of the suspension arising from the student conduct proceeding underlying the present case.

## AS AND FOR A FIFTH CAUSE OF ACTION
### Breach of Contract

171.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

172.    Based on the aforementioned facts and circumstances, defendants breached express and/or implied agreements with plaintiff.

173.    RPI committed several breaches of its agreements with plaintiff, including, but not limited to, its failure to provide plaintiff with the rights contained in its Policy, to which plaintiff became entitled upon matriculation at the defendants institution.

174.    Under the Policy, plaintiff was guaranteed the right to "[p]articipate in a [student conduct] process that is fair, impartial, and provides adequate notice and a meaningful opportunity to be heard."

175.    Plaintiff was denied this and other rights, as set forth above.

176.    Plaintiff is entitled to recover damages for RPI's breach of the express and/or implied contractual obligations described above.

177.    As a direct and foreseeable consequence of these breaches, plaintiff sustained tremendous damages including, but not limited to, emotional distress, loss of educational and extracurricular opportunities, economic injures, loss of future employment opportunities, and other direct and consequential damages.

178.    As a result of the foregoing, plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorney's fees, expenses, costs, and disbursements, as well as the removal of all notations on his transcript and termination of the suspension arising from the student conduct proceeding underlying the present case.

## AS AND FOR A SIXTH CAUSE OF ACTION

**Covenant of Good Faith and Fair Dealing**

179.   Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

180.   Based on the aforementioned facts and circumstances, RPI breached and violated a covenant of good faith and fair dealing implied in the agreement(s) it made with plaintiff upon his admission to the school by meting out the unwarranted and disproportionate sanctions it imposed upon plaintiff, erroneously establishing plaintiff's responsibility for sexual misconduct, failing to hear plaintiff's claims against Ms. Roe.

181.   Plaintiff is entitled to recover damages for defendants' breach of the express and/or implied contractual obligations described above.

182.   As a direct and foreseeable consequence of these breaches, plaintiff sustained tremendous damages including, but not limited to, emotional distress, loss of educational and extracurricular opportunities, economic injures, loss of future employment opportunities, and other direct and consequential damages.

183.   As a result of the foregoing, plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorney's fees, expenses, costs, and disbursements, as well as the removal of all notations on his transcript concerning this determination, and termination of the suspension arising from the student conduct proceeding underlying the present case.

**AS AND FOR A SEVENTH CAUSE OF ACTION**
**Unfair or Deceptive Trade Practices**

184.   Plaintiff repeats and realleges each and every allegation above as if set forth fully herein.

185.    Section 349 (a) of the General Business Law provides consumer protection by declaring unlawful "deceptive acts and practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state."

186.    In providing an education to plaintiff in return for tuition, RPI is both conducting business and providing a service to plaintiff.

187.    RPI's Policy states that students accused of misconduct will be allowed to "[p]articipate in a process that is fair, impartial, and provides adequate notice and a meaningful opportunity to be heard."

188.    By failing to deliver on this promise to plaintiff, RPI has engaged in the following acts that are deceptive or misleading in a material way, or has committed deceptive acts or practices, which were aimed at the consumer public at large, that were a representation or omission likely to mislead a reasonable consumer acting reasonably under the circumstances:

      i.    By causing plaintiff to believe that RPI would follow its own policies, of which plaintiff was made aware during the proceedings against him; and

     ii.    By causing plaintiff to believe that, if he abided by the terms of his admission to RPI, RPI would uphold its reciprocal obligations, covenants, and warranties to plaintiff as described in its polices.

189.    Defendants had no intention of following its own policies and procedures for plaintiff as a male student accused of sexual misconduct in the face of evidence to the contrary.

190.    RPI's stated policies and procedures, together with its violations against plaintiff as a male student accused of sexual misconduct, demonstrates defendants' deceptive practices with respect to male student accused of sexual misconduct and subject to the biased Title IX procedures at RPI.

191.    Based on the foregoing facts, defendants engaged in unfair or deceptive trade practices in violation of General Business Law § 349 (a).

192.     As a direct and foreseeable consequence of these breaches, plaintiff sustained substantial damages including, but not limited to, emotional distress, loss of educational and extracurricular opportunities, economic injures, loss of future employment opportunities, and other direct and consequential damages.

193.     As a result of the foregoing, plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorney's fees, expenses, costs, and disbursements, as well as the removal of all notations on his transcript concerning this determination, and termination of the suspension arising from the student conduct proceeding underlying the present case.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### Estoppel and Reliance

194.     Plaintiff repeats and realleges each and every allegation above as if set forth fully herein.

195.     RPI's Policy constitutes representations and promises that RPI should have reasonably expected to induce action or forbearance by plaintiff.

196.     RPI expected or should have expected plaintiff to accepts its offer of admission, to incur tuition fees and expenses, and to choose not to attend other colleges based on defendants' express and implied promises that RPI would not tolerate—and plaintiff would not suffer—the denial of any rights, including that of due process enshrined in Title IX and OCR guidance, should plaintiff be accused of any violation of RPI's Policy governing its students.

197.     Plaintiff relied to his detriment on these express and implied promises and representations made by defendants.

198.     Based on the foregoing, defendants are liable to plaintiff based on estoppel and plaintiff's reasonable reliance on defendants' promises and representations.

199.    As a direct and foreseeable consequence of these breaches, plaintiff sustained substantial damages including, but not limited to, emotional distress, loss of educational and extracurricular opportunities, economic injures, loss of future employment opportunities, and other direct and consequential damages.

200.    As a result of the foregoing, plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorney's fees, expenses, costs, and disbursements, as well as the removal of all notations on his transcript, concerning this determination, and termination of the suspension arising from the student conduct proceeding underlying the present case.

## AS AND FOR A NINTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress

201.    Plaintiff repeats and realleges each and every allegation above as if set forth fully herein.

202.    Based on the foregoing facts and circumstances, defendants intentionally and/or with willful or wanton indifference to the truth, engaged in conduct designed to suspend plaintiff from RPI and ruin his reputation without regard to the truth of the allegations made against him or to the severity of the sanctions imposed upon him, and otherwise intentionally inflicted emotional distress upon him.

203.    The above actions and inactions by defendants were so outrageous and disproportionate to any wrong committed by plaintiff that they caused to him extreme mental anguish, psychological and emotional distress, physical harm financial loss, humiliation, loss of reputation and future academic and educational opportunities, together with other damages.

204.    Plaintiff has been and continues to be treated by a clinician for mental health issues as a result of the situation giving rise to this litigation.

205.    As a direct and proximate result of the above conduct, plaintiff sustained substantial damages, including, but not limited to, emotional distress, psychological damages, loss of educational and academic opportunities, economic injuries and other direct and consequential damages.

206.    As a result of the foregoing, plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorney's fees, expenses, costs, and disbursements, as well as the removal of all notations on his transcript and termination of the suspension arising from the student conduct proceeding underlying the present case.

## AS AND FOR A TENTH CAUSE OF ACTION
### Negligence

207.    Plaintiff repeats and realleges each and every allegation above as if set forth fully herein.

208.    Defendants owed a duty of care to plaintiff, as they do to all students enrolled at RPI.  Such duties included, but were not limited to, a duty of reasonable care in their application of RPI's Policy processes and investigation of the allegations of misconduct against him.

209.    Defendants breached these duties to plaintiff.

210.    As a direct and proximate result of the above damages, plaintiff sustained substantial damages, including but not limited to, emotional distress, psychological damages, loss of educational and athletic opportunities, economic injuries, and other direct and consequential damages.

211.    As a result of the foregoing, plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorney's fees, expenses, costs, and

disbursements, as well as the removal of all notations on his transcript and termination of the suspension arising from the student conduct proceeding underlying the present case.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
### Declaratory Judgment

212.    Plaintiff repeats and realleges each and every allegation above as if set forth fully herein.

213.    Defendants have committed numerous violations of the parties contracts and of federal and state law.

214.    Plaintiff's educational and future career prospects have been severely damaged by defendants' actions.  Without appropriate redress, the unfair outcome of the Title IX proceeding against plaintiff will continue to cause ongoing and irreversible damages to him.

215.    As a result of the foregoing, there exists a justiciable controversy between the parties with respect to the outcome, permanency, and future handling of plaintiff's formal student record at RPI.

216.    By reason of the foregoing plaintiff request, pursuant to 28 U.S.C. § 2201, a declaration that: (i) the outcome and findings made by defendants following plaintiff's Title IX hearing and appeal be reversed; (ii) plaintiff's disciplinary record be expunged; (iii) the record of his suspension from RPI be removed from his student record, educational file, and or any other document relating to plaintiff's time at RPI; (iv) any record(s) of his hearing and/or appeal be permanently destroyed; and (v) RPI's rules, regulations, and guidelines are unconstitutional as applied.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons plaintiff demands judgment against defendants as follows:

A.      Award plaintiff all of his damages in an amount to be determined at trial under Title IX of the Education Amendments of 1972, Section 349(a) of New York State General Business Law, state common law, including, but not limited to, damages to physical well-being, emotional, mental, and psychological health, damages to reputation, past and future economic losses, loss of educational opportunities, loss of future career prospects;

B.      Award plaintiff all attorneys' fees, costs, and expenses available under the law;

C.      Award plaintiff all prejudgment and postjudgment interest available under the law;

D.      Order defendants to remove all notations on plaintiff's transcript and terminate the suspension imposed arising from the student conduct proceeding underlying the present case;

E.      Declare pursuant to 28 U.S.C. § 2201 that (i) the outcome and findings made by defendants following plaintiff's Title IX hearing and appeal be reversed; (ii) plaintiff's disciplinary record be expunged; (iii) the record of plaintiff's suspension from RPI be removed from his student record, educational file, and/or any other document relating to his time at RPI; (iv) any record(s) of his hearing and/or appeal be permanently destroyed; and (v) defendants' rules, regulations, guidelines, and policies violated plaintiff's due process rights as applied;

F.      Award plaintiff such additional and further relief as this Court may deem just and proper.

Dated: August 23, 2018

**E. STEWART JONES HACKER MURPHY, LLP**

By:    _____

James C. Knox, Esq.  (517109)
Julie A. Nociolo, Esq. (519914)
*Attorneys for Plaintiff*
28 Second Street
Troy, New York 12180
(518) 274-5820
jknox@joneshacker.com
jnociolo@joneshacker.com